The final case for argument this morning is 25-1310, Seneca Foods v. United States. Mr. Smith, please proceed. Thank you, Your Honor, and may it please the Court. With the express goal of increasing the domestic industry's capacity utilization rate to 80 percent, the President called for exclusions where a particular steel product is not produced, quote, in a sufficient and reasonably available amount. Our client, Seneca Foods, the last food company in the United States that still makes its own cans, bought as much 10-mil steel as possible from the only three domestic producers until each reached peak capacity and then placed limited orders for imports to fill the gap. Afterwards, Seneca filed product exclusion requests to cover only those specific orders that the domestic mills had expressly declined to fill. This approach was fully consistent with the proclamation's focus on capacity utilization. But the problem is timing, right? I mean, that's the problem. We've got this 90-day kind of time frame, and you've not challenged that in any way. It is, Your Honor, but the 90-day time frame is not as rigid as the agency suggests. I mean, the problem here is timing, but the agency is clear that it is agnostic as to whether exclusion requests are filed before or after purchase orders are placed. They are, by definition, retroactive to the date of filing. That's not quite the point. I mean, I thought, at least as I understand it, you'll correct me if I'm wrong, that it might be a day before the order or a day after the order, but that's not, I thought, what the dispute here is. You have the requests being filed six months or something after the order with then a delivery date still much further into the future in some cases, and I thought that the agency said, we're interested in the availability of the U.S. supplier more or less now, not six months ago. The agency has said that they are focused on the availability of the supplier now, but they have not restricted themselves tightly to that time frame. Here, some of the orders were placed six months earlier, as you say. Some were just placed very close in time, and I think it's important to note that what we have here is undisputed record evidence, not just undisputed, but validated and confirmed by U.S. Steel, that it had every opportunity to make these sales, that it was the only among the three mills, the only one that had zero capacity to offer Seneca across multi-year time frame, yet it was the only mill that filed objections, claiming that it could in the future potentially provide some spot availability. Seneca provided uncontested evidence of unrelenting, complete unavailability over this extended time frame, but in evaluating that evidence, Commerce effectively placed Seneca in a catch-22 with no chance to prevail. It was kind of a heads-I-win, tails-you-lose situation, and in our view, that's arbitrary and capricious in multiple respects, and let me explain that we have two principal and alternative arguments that I think it's important to disentangle. The first is that, as you say, as to timing, Commerce just declined to evaluate availability at the time Seneca placed its purchase orders, and note that at that time, there is no dispute as to the unavailability from U.S. Steel. Even though the regulations that Commerce is applying here state that it will take into account the requester's specified business activities, even though they say they will take into account kind of case-by-case, record-intensive, fact-specific inquiry in each case, and even though they've applied these in a flexible way in other contexts, but they selectively ignored the key fact about Seneca's request that, granted, these exclusions will be applied only to orders placed at a time of undisputed unavailability. But there's also a catch-22, because in the way they evaluated the evidence, they only selectively ignored the timeframe of the covered orders, and this is clearest in the March 2022 request. Here, Commerce, on the one hand, applied the 90-day rule that you mentioned at first and said the November 2021 emails, which is close in time to when the orders were placed, were not relevant because they were outside of the 90 days and did not speak to the agency's focus on kind of future availability. But when presented with evidence of future unavailability in an email chain within the 90-day window, right, that was spanning a period of months from February to April 2022. Can you give me the number of the exclusion requests you're talking about? There are two in March. One is 283368 and the other is 283369. And these were for roughly 24,000 tons of 10-mil steel. So, again, they invoke the 90-day rule with respect to the November 2021 emails. But when presented with evidence of unavailability within the timeframe, they say is appropriate to evaluate, they chose to disregard them because they claimed the emails do not pertain to the product specifically at issue because the emails were sent after the purchase orders at issue were placed. So this is, you know, if the relevant orders for the product specifically at issue in these requests, if that's them in this earlier timeframe, why is Commerce closing its eyes to availability at the time those orders were placed? What they're effectively saying is that, yes, you can place an order, then file a request, but if you give us correspondence, sales correspondence about your regular communications with this objector, we will disregard it either for being too early if it's outside the 90-day window or for being too late if it's after the purchase order was placed. I guess what it seems like the result is is that you can place your order and file an exclusion request later, and depending on the state of the evidence, maybe nobody comes in with an objection, and then you're going to win, or maybe, you know, who knows what will be in the evidentiary record, but you might wind up in the situation where the gap in time has made it harder for you to present the persuasive case. I don't see why that means you win. Well, I mean, I think it's also important to note that the 90-day rule, and I mentioned this earlier, Judge Prost, says that they're not going to look outside of 90 days absent additional accompanying information. So it's not like a rigid 90-day rule, and that's not in the regs in any event. I believe it's just in their decision memorandum, right? So it's not something that's inflexible and rigid, and when asked by the lower court, what do you mean by additional accompanying information, they explained that would be information that would indicate the continued relevance and probative value of otherwise stale evidence. Here, again, long chain, undisputed, affirmatively acknowledged by U.S. Steel, yet the agency has chosen to put on blinkers and kind of play a gotcha game. This goes to our first argument, I just want to be clear, which is that the agency, in applying the regs to Seneca, acted arbitrarily and capriciously by not taking into account, or rather by only selectively taking into account, the dates on which the orders were placed and the products to which those pertain. So that's part one. But there's no regulatory or statutory regime that you can point to that says that they have to take this into account? What we have to point to, you're right, in terms of saying they have to take it into account, but what they have here is a proclamation saying that the goal is increasing domestic steel industry's capacity utilization. That requires ensuring that the domestic steel producers had an opportunity to make these sales. Here, while it may be necessary to take a totally prospective approach in other factual contexts, it's inappropriate in our view here and should not have been done. So that's argument one. Argument two is that even under their fully prospective account, with the 90-day rule in place, it was arbitrary and capricious for them to come up with self-contradictory and implausible reasons to ignore every single piece of evidence from Seneca confirming sustained unavailability, yet then to credit a single rote or cookie-cutter claim of possible future spot availability by U.S. Steel. The agency reversed the burden of proof set out in its own regulations. Its regulations say that if an objection is filed, the burden is on the supplier to demonstrate that the exclusion should be denied. That's at 158. But the remand... I'm sorry, am I remembering right? That's the March version of the interim rules? 158, I don't have it in front of me in terms of the date, but I believe that was something that's been relatively consistent from the beginning. It's just about if an objection is filed, here's what the objection means to me. Which was that? 2018. Right, but wasn't there then there was a later version that's where I think that language doesn't reappear? And it's not in the regulation. This was in a comment, right, in response or the agency's response to comments? Yes, yes. But in the way that the agency went about deciding kind of objections, it applied it in exactly that way. It said the burden is on the objector to meet each of the criteria to show that it can do the quantity that's required, that it can do it within a timely basis, and it has to prevail on each and every one for its objection to be sustained. But in the remand determination, the agency repeatedly says that Seneca failed to meet the unavailability criterion, that Seneca failed to establish that the required product could not be timely produced domestically. I meant September 2018. September, thank you. So in our view, there are at least a couple of examples of heads I win, tails you lose reasoning, even under the agency's preferred approach to these questions. Can I ask this? I don't know whether this is clear, and I should know this by now. So when you place an order to some foreign supplier, and these particular orders, I guess, and maybe even more generally, do you then enter into a contract in which both sides are bound so that, I don't know, the Turkish supplier of steel commits to sell you 100,000 tons or whatever it is that you commit to buy, so that later the regulatory process is only about how much duty will be paid rather than not buying from that supplier and switching to U.S. steel? Yes, there's no discussion or no part of the regulatory process that is about switching to U.S. steel. Right, but when you're making your request for an exclusion, do you already have a binding commitment to, in these cases, in this case, right, because you have the orders, to buy from abroad? It is not required that anyone do so. You could do it either way. Did Seneca have a binding commitment? It had certainly entered into a purchase order. I don't know the terms and conditions under which it might have gotten out of that purchase order, but certainly orders had been placed. They were for specific volumes. They had specific shipment dates and arrival dates that were relevant to whether the order would not be owed given the status of the exclusion. Yes, all of that was true. But to be clear, when U.S. steel filed its objection, Seneca's response, as it told the agency, was this is excellent news because we haven't been able to get anything from U.S. steel up to this point. Now that they've objected and certified they can provide full and complete coverage of the orders that we had to place with imports, we're going to go buy from them. Seneca tried to do so, and Seneca failed. And that's what these February to – I'm sorry. I'm missing the point. Seneca tried, so left aside the other contractor proposal. No, no, because the other contract was for earlier timeframe orders. That's done. That's baked. Now Seneca is trying to get additional tons because it still needs additional tons from U.S. steel going forward. Not the orders at issue. It's not going to – Oh, not the orders at issue. Not the orders at issue. Oh, okay. So they said great. New orders. That doesn't have any impact on what we're litigating. Well, it does because that's what the agency is asking. Would U.S. steel be able to provide these volumes? They don't care when you place an order. They don't care what your contract terms are, right? So it speaks directly to would the tons that are at issue in this exclusion request be available from U.S. steel as they certified they would be? And two examples, very important. Number one, for the October 2021 request, the objection comes in 30 days later. Seneca sees it, immediately reaches out and says, can you provide us with volume that you couldn't provide us earlier? And U.S. steel says no. Right now as of February we can't give you anything. We'll let you know if that changes. That was after they had certified immediate and complete coverage of the full volume at issue in the exchange. So the question for the agency is, well, that's within 90 days. It's directly relevant. It's the same products. It directly contradicts and casts doubt on the objection filed, right? It looks like U.S. steel's legal and commercial teams are not coordinating well. And the agency chooses to discount it based on its reading of that as relating only to contract volume and not to spot volume, right? We are almost done with your rebuttal time. So unless my colleagues have any questions, we'll restore some rebuttal time. But let's move to the other side. Thank you very much, everyone. I apologize for running out. Come on. Good afternoon, Your Honors. May I please support this? The trial court got it right and held that the evidence that the CIT characterized as three short email chains, each suffering from various deficiencies as to relevance, did not compel the Department of Commerce to grant these exclusion requests. This is a classic case of weighing of the evidence, and although at best Seneca's provided perhaps another way to read their evidence, it's not reading that was compelled by the record that was before Commerce. Well, he's trying to be able to put the label arbitrary and capricious on this. So what is your response? I mean, one of the initial arguments he made is that Commerce is not acting consistently in its application of this so-called rule. Well, if the argument is with respect to other exclusion requests that were not at issue in this litigation, I think as we explained in our brief, there's not a demonstrating isolated circumstances in which on different records, different facts, different importers. I thought he was talking about some of these, but I wasn't clear, so I thought maybe you would know better than I because you're more familiar with them. I thought he did make, he called out two orders or two requests, 283, 368, the March 2022, the 368 and 369 orders where I think he said, there you did depart from the strict 90-day rule or something. Right, so those two March 2022 requests are dealt with on page 124 to 126 of the administrative record. This is the remand redetermination. Commerce was entirely consistent. I mean, I think Commerce went through three pages of single-spaced analysis about why it was interpreting the November 2021 email as referencing contract opportunities rather than just availability in general. And again, going back to page 121 explaining that there was other record evidence where U.S. Steel confirms that it didn't have availability to enter into contract volumes, but it did have availability on a spot sales basis. And importantly, U.S. Steel then also certified and provided confidential business information indicating which tin mills were going to be able to manufacture this product, what its current capacity utilization rate was, what its delivery was, where the delivery would be coming from. So there was fairly specific probative evidence that Commerce could reasonably rely upon and find that that was evidence of domestic availability that Seneca's, again, sparse email exchange didn't overcome. Can I ask you one sort of technical thing in that document elaborating on the reasons for denying the exclusion request? So on the October exclusion request, the first one, this is on 119, you're trying to figure out whether there will be steel available by a particular date in order to determine whether that exclusion request should be granted or not. And to do that, you look to the time that the exclusion requests were posted to your portal, and then you add basically all the relevant times that the buyer was provided to that date. But we know that the orders were placed before that October exclusion date, so why are you using the October posting date and adding to that rather than when the orders were placed? Right. I think the answer, as the child court explained at page 22, is simply what Commerce said, is administrative consistency. So it's consistent. Commerce, during the course of this program, which was about five years, Commerce was receiving over 6,000 of these per month, these requests. So this is a matter of administrative regularity. To start that clock from the date of the exclusion request is just an easy way to do it. And it's also consistent with the purpose of the proclamation, which was to look at what is the current state of play with domestic steel manufacturing. And so starting from the date of the exclusion, which is the first date that the Department of Commerce knows about the request, is certainly one reasonable way to calculate it. And you go back 90 days. So the 90 days was sort of a general timeframe to address whether Commerce would consider sales correspondence to be relevant or stale. And so, yeah, the 90 days would go backwards from the date of the exclusion request. Because would it be right to say that otherwise there might be a problem with respect to the underlying purpose where a domestic purchaser would go out and buy a very large amount from a foreign supplier to meet its needs for the next year and a half? Delay, and even as it knows that the domestic producers are not in very good shape right now, but they're increasing their production and that kind of thing ought to be discouraged under this program, a kind of long-term contract that would get the exclusion from the extra tariff for a long period when the domestic supplier could actually meet the supply, meet the demand. Right. I think that's fair. Really, again, if we start from stepping back, as Your Honor noted, we start with the purpose of the Section 232 measures to begin with, which is to help improve domestic manufacturing facility ability. And then the exclusions were like a carve-out to that. If these products are not available in the United States in the quantity, quality, and timeliness required, then we'll make an exception and you won't be subject to the Section 232 duties. But everybody expected that, one, the steel industry is dynamic and things are changing, and we also expected an improvement. It was entirely up to a requester such as Seneca to make business decisions about who to purchase from, when to purchase from, what terms of sale. There may be any number of reasons why Seneca might have, or any other importer, might have chosen to prefer to import from a foreign supplier, but that didn't entitle it to duty-free treatment under the regime. Is there any record on the withdrawal of this ability to file an exclusion request? Is it documented why that was done? Was it because, hey, we think we've reached a good time and there's fewer coming in, or was it because everybody continued to make these requests? Is there anything in the record that you can explain? The president—so it was revoked by presidential proclamation in 2025. I don't have that particular proclamation in front of me, but— In February? Yes, February of 2025. And was there an explanation about— I don't have an— I assume there's some explanation. Yeah, I assume that there is. I don't have it off the top of my head. I think in some, Seneca wants commerce to almost revise or ignore its regulations in order to accommodate its business decisions, and having demonstrated that the regulations themselves, the procedures, were reasonable, commerce's application of those was not unfair to Seneca. Thank you. We respectfully request that the court affirm the judgment of the Court of Intervention. We'll restore three minutes to rebuttal. Or do we have rebuttal time left? Okay, we'll restore two minutes to rebuttal. Thank you very much. Just very quickly, our second argument, as I was noting before, is not that we want the regulations revised. We want them applied appropriately and consistently. And here, commerce did not weigh the evidence in these e-mails that directly contradicts U.S. Steel's representations. It engineered ways to disregard them entirely. It did not evaluate them. First, it disregarded the November 2021 e-mails because it misread them as applying only to contract volumes when they're expressly about availability in a particular month, February, and when the February to March, rather, April e-mails specifically have U.S. Steel referencing, do you want me to quote for Spot May business, just like the Spot February business that was discussed before. So that's the first. And second, they completely disregard, not weigh, the February to April 2022 e-mail chain because the orders that Seneca would apply these exclusions, if granted to, were placed before. So they said it was not the same products. It is the same products. It is not our only argument that the regulations, in our view, do not take this kind of scenario into account. It's that even under the regulations as traditionally applied, the agency acted arbitrarily and capriciously to engineer ways to disregard the clear and consistent evidence of unavailability that Seneca placed on the record. I would also note, just on the revisions that were made to the proclamation and to the elimination of the system, one of the problems that came up in the operation of this system that's in the record is that companies that did not place orders and then filed limited requests to cover them were placing requests with multiple suppliers, right? And there were more exclusions being granted than were being utilized. And Commerce's response to that was to conduct something new called a volume certification review. And in that volume certification review, it would require certain requesters to actually provide evidence of a purchase order placed prior to the exclusion request being filed. So that problem would never have materialized under Seneca's approach. It's something the agency adapted to. But it's another reason, I think, that the approach that Seneca took, even under the agency's own preferred approach of assessing future availability, there was compelling evidence here of unavailability from U.S. Steel, and the agency did not render a decision that is well-reasoned. It was rather engineered to reach a certain result. Okay. Thank you. Thank you. We thank both sides. The case is submitted. That concludes our proceeding.